# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 18-1498

———————————————

Ronnoco Coffee, LLC, et al.

*Plaintiffs - Appellees*

v.

Westfeldt Brothers, Inc.

*Defendant - Appellant*

————————

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

————————

Submitted: April 16, 2019
Filed: September 19, 2019

————————

Before LOKEN, WOLLMAN, and STRAS, Circuit Judges.

————————

LOKEN, Circuit Judge.

The principal issue in this case is whether a corporation that acquires substantially all the assets of an unrelated competitor at a secured creditor's private foreclosure sale, in an agreement that declines to assume the competitor's liabilities, is nonetheless liable as the competitor's successor for unpaid pre-acquisition inventory purchases from a third party. Finding no prior case imposing successor

liability in these circumstances, and prevailing law to the contrary, we affirm the district court's grant of summary judgment.[1]

## I. Background Facts and Procedural History.

In 2013, Scott Meader, CEO of Ronnoco Coffee, LLC, a Missouri-based coffee roasting company, traveled to Iowa to discuss a potential acquisition of U.S. Roasterie, Inc. ("USR"), an established roasting company based in Des Moines. USR's President, Howard Fischer ("Fischer"), expressed interest. Ronnoco's due diligence during 2014 negotiations revealed that USR was substantially in debt to various creditors, including its principal coffee supplier, Westfeldt Brothers, Inc. ("Westfeldt"), a Louisiana corporation based in New Orleans.

Westfeldt began selling coffee to USR in 2010. By August 2012, USR owed Westfeldt over $3 million on open account coffee sales. Though aware of USR's financial difficulties, Westfeldt continued to sell coffee on unsecured credit. In April 2013, Westfeldt advised USR it would ship only upon payment of an amount greater than the value of the new shipment. Westfeldt applied subsequent USR payments to old unpaid invoices, reducing USR's debt to approximately $2.9 million by August 2013. However, USR refused to secure its outstanding debt, and Westfeldt never obtained a purchase money security interest in coffee shipped to USR.

In October 2014, Great Western Bank declined to extend over $5 million in maturing secured loans to USR. Great Western foreclosed its security interests when USR did not comply with the Bank's demand for repayment in full. Great Western's security interests included green coffee sold to USR by unpaid vendor Westfeldt.

---

[1]The Honorable Jean C. Hamilton, United States District Judge for the Eastern District of Missouri.

Based on its due diligence, Ronnoco was unwilling to purchase assets directly from USR. Aware of USR's default on Great Western loans, Ronnoco discussed the purchase of USR assets at a Great Western private foreclosure sale and formed Mid-America Roasterie, LLC for this purpose. On February 9, 2015, Great Western sold its USR collateral at a private sale to Mid-America, consistent with the terms of the loans and the Iowa Uniform Commercial Code. Mid-America paid Great Western $2,098,670.80 for the former USR assets (plus $35,000 for vehicles). It is undisputed this was a commercially reasonable transaction. See Iowa Code Ann. § 554.9610.2. After the foreclosure sale, approximately $3,150,000 of USR's secured debt to Great Western and $2,690,000 of its unsecured debt to Westfeldt remained unpaid.

The February 2015 Sale Agreement expressly provided that Ronnoco and Mid-America (collectively "Ronnoco") did not assume USR liabilities or obligations. After purchasing the former USR assets, Ronnoco continued coffee roasting operations at USR's Iowa location, retained most USR employees, employed USR's former President Fischer for some ten months, and employed its former CFO, Chris Hodgson, for approximately six months. The USR corporate entity was not dissolved immediately after Great Western's foreclosure sale.

Ronnoco commenced this action seeking a declaration that Ronnoco is not liable to Westfeldt for USR's debt and did not assume USR's obligation to perform alleged future coffee supply contracts. Westfeldt filed counterclaims against Ronnoco, asserting claims of successor liability, breach of the future contracts, unfair trade practices, conversion, and unjust enrichment. Westfeldt also asserted third party claims against two Ronnoco corporate officers, Meader and Eric Bomball, for tortious interference with contract and conspiracy to commit tortious interference. The parties disputed whether these claims should be determined under Iowa or Louisiana law. The district court applied Iowa law to Westfeldt's successor liability and unjust enrichment claims, and Louisiana law to the unfair trade practices, conversion, and tortious interference claims.

-3-

The district court initially dismissed the "futures contracts" and tortious interference claims for failure to state a claim. It then entered a final summary judgment dismissing Westfeldt's counterclaims for successor liability, unfair trade practices, conversion, and unjust enrichment, primarily on the ground that Westfeldt failed to submit evidence that the foreclosure and asset sale were anything but bona fide business transactions. Westfeldt appeals these decisions. Reviewing the grant of summary judgment, the Rule 12(b)(6) dismissals, and the district court's choice of law determinations *de novo*, we affirm. See Campbell v. Davol, Inc., 620 F.3d 887, 891 (8th Cir. 2010) (summary judgment); Casazza v. Kiser, 313 F.3d 414, 418 (8th Cir. 2002) (12(b)(6) dismissal); St. Paul Fire and Marine Ins. Co. v. Bldg. Constr. Enters., Inc., 526 F.3d 1166, 1168 (8th Cir. 2008) (choice of law).

## II. Ronnoco's Successor Liability.

A. Choice of Law. Applying Missouri choice of law principles, the district court concluded that Iowa law governs the question of Ronnoco's successor liability to Westfeldt. See Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 494-98 (1941); Kennedy v. Dixon, 439 S.W.2d 173, 184-85 (Mo. banc 1969). Westfeldt's lead argument on appeal is that the district court erred in not applying Louisiana law. "[W]here the laws of the two jurisdictions would produce the same result on the particular issue presented, there is a 'false conflict,' and the Court should avoid the choice-of-law question." Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 462 (3rd Cir. 2006).

The well-settled general rule, adopted in virtually every State, is that "where one company sells or otherwise transfers all its assets to another company, the latter is not liable for the debts and liabilities of the transferor." 15 Fletcher Cyclopedia of Corporations § 7122, at 229-30 (2017 rev. ed.). There are well-recognized exceptions to the general rule of nonliability: where the transaction includes an express or implied agreement to assume liabilities, or involves a de facto corporate merger or

consolidation, or where the transaction was fraudulent, or where the asset purchaser is a "mere continuation" of the seller.  Id. at 240.  Both the Supreme Court of Iowa and the Court of Appeal of Louisiana have adopted these principles.  See Pancratz v. Monsanto Co., 547 N.W.2d 198, 200 (Iowa 1996); Sinclair Ref. Co. v. Rayville Motor Co., 160 So. 179, 181-82 (La. App. 1935).

In this case, Westfeldt contends that both the mere continuation and fraud exceptions apply to impose successor liability.  Ignoring the fact that the courts of both States apply the same general rule and its exceptions, Westfeldt urges us to conclude that Iowa and Louisiana courts employ "substantially different successor liability analyses" in applying these two exceptions.  Westfeldt focuses on points emphasized in factually dissimilar prior cases, such as the importance of continuity of management and ownership, versus whether substantially all the assets were sold.  On the facts of this case, we conclude that the *result* would be the same under the law of both States -- no successor liability.  Accordingly, while we note that the district court's decision to apply Iowa law to a contract for the sale and delivery of assets located in Iowa is well-supported, see Restatement (Second) of Conflict of Laws § 191 (Am. Law Inst. 1971), we will avoid deciding the choice-of-law question.

B. Merits.  Successor liability is imposed under the mere continuation exception "when the transferee corporation is merely a continuation or reincarnation of the transferor corporation.  In determining whether one corporation is a continuation of another, the test is whether there is a continuation of the corporate entity of the transferor -- not whether there is a continuation of the transferor's business operation."  Grand Labs., Inc., v. Midcon Labs of Iowa, Inc., 32 F.3d 1277, 1282-83 (8th Cir. 1994) (quotation omitted; applying Iowa law); see 15 Fletcher § 7124.10, at 314-16 & cases cited.

Here, USR's assets were acquired by Ronnoco, another coffee roasting company, in an arm's-length transaction.  There was no continuity of ownership or

management after the Asset Sale.  True, Ronnoco retained USR employees after the acquisition, including two members of management for short periods.  But this is common after such acquisitions and is not evidence of "mere continuation" of the company whose assets are acquired.  This is not a case where the owners of a failing business, to avoid successor liability, inserted relatives as sham owners and directors of a new company that continued the asset seller's business.  See Grand Labs., 32 F.3d at 1284, discussing C. Mac Chambers Co., Inc. v. Iowa Tae Kwon Do Acad., Inc., 412 N.W.2d 593 (Iowa 1987).[2]  Iowa courts "have never applied the mere continuation exception where the buying and selling corporations had different owners."  Pancratz, 547 N.W.2d at 201.  Westfeldt cites no contrary Louisiana decision, and we have found none.  Cf. Pichon v. Asbestos Defendants, 52 So. 3d 240, 244 (La. App. 2010) ("[T]he facts showing one corporation to be merely a continuation of the other would have to be especially compelling to impose liability upon a corporation that has expressly contracted out of such liability.").

Westfeldt argues the foreclosure and asset sale were an effort by USR to escape liability to Westfeldt by placing assets beyond the reach of creditors.  Ronnoco, USR, and Great Western "developed a plan" where USR would intentionally stop servicing its debt so Great Western could foreclose.  There is sufficient evidence of mere continuation and fraud, Westfeldt argues, because Ronnoco effectively controlled USR by the end of their acquisition negotiations and, prior to the asset purchase, directed USR to stop payment on an $85,371.23 check to Westfeldt.

The district court concluded that Westfeldt submitted no evidence supporting this theory.  We agree.  The essential contrary fact is that Ronnoco purchased USR's assets, not from USR, but from Great Western, a secured lender that had foreclosed

---

[2]"[I]n retrospect the [C. Mac Chambers] holding perhaps better exemplifies the fraud exception, not the mere continuation exception, to the general rule of nonliability."  Pancratz, 547 N.W.2d at 202.

on USR's assets, in a transaction that did not fully repay Great Western's secured debt. It is undisputed that, when Great Western's loans to USR matured, Great Western declined to extend the loans, demanded repayment in full, foreclosed when USR failed to pay, and sold its collateral at a private foreclosure sale at a commercially reasonable price. It is clear that Ronnoco was unwilling to risk assuming USR's debts to creditors such as Westfeldt by purchasing the assets of a going concern directly from USR. Buying USR assets from Great Western at a foreclosure sale in an agreement that disclaimed assumption of USR liabilities protected Ronnoco from claims that the asset purchase was tainted by commercially inadequate consideration. Great Western, acting in its own financial interest, made the decision to sell.

There is nothing inherently wrongful or fraudulent in purchasing assets at a foreclosure sale, free from encumbrances, rather than directly purchasing the assets. Ronnoco "had no duty to rescue [USR], much less [Westfeldt]." Noble Sys. Corp. v. Alorica Cent., LLC, 543 F.3d 978, 984 (8th Cir. 2008). We assume without deciding that, under Iowa or Louisiana law, "an intervening foreclosure sale affords an acquiring corporation no automatic exemption from successor liability" *if* the acquiring corporation otherwise qualifies as the debtor's successor. Ed Peters Jewelry Co. v. C & J Jewelry Co., 124 F.3d 252, 267 (1st Cir. 1997). But that principle does not apply because Westfeldt presented insufficient evidence of mere continuation or fraud had Ronnoco purchased the assets directly from USR. Great Western's actions furthering its own interests as secured lender simply confirmed the legitimacy of an asset purchase by a purchaser that did not assume the former owner's liabilities. Cf. Bourque v. Lehmann Lathe, Inc. 476 So. 2d 1125, 1129 (La. App. 1985) ("[N]o discovered case from any of our sister states has ever premised successor liability on a connection as tenuous as a partial purchase of a dissolving firm's assets at a bankruptcy auction.").

Lastly, we agree with the district court there is an additional reason why Westfeldt's fraud exception claim failed to establish a submissible case of successor liability -- Westfeldt offered no evidence that it was prejudiced by the asset sale. It is undisputed that USR, in substantial debt to multiple creditors, was unable to make timely payments to either Great Western or Westfeldt. Great Western, having obtained a priority interest in USR's assets, foreclosed and made a valid financial decision to sell its collateral to Ronnoco at a commercially reasonable price. The sale proceeds did not satisfy USR's entire debt to Great Western. After the sale, Great Western's unpaid secured claim continued to have priority over Westfeldt's unpaid unsecured claims. Ronnoco as an independent purchaser had no duty to rescue USR or Westfeldt. See Grand Labs., 32 F.3d at 1282; Lumley v. Advanced Data-Comm, Inc., No. 09-0224, 2009 WL 2514084, at *4 (Iowa App. Aug. 19, 2009) (a successor liability plaintiff must prove the "purchase . . . was fraudulent"). Thus, there is no evidence that, absent the alleged fraud by Ronnoco, USR would have been able to pay off its entire debt to Great Western *and then* make payment to Westfeldt.

### III. Westfeldt's Other Claims.

A. Unfair Trade Practices. The district court's conclusion that Louisiana law applies to Westfeldt's unfair trade practices claim is not at issue on appeal. Westfeldt contends that Ronnoco violated Louisiana's Unfair Trade Practices and Consumer Protection Law ("LUTPA") when it (1) directed USR, prior to the acquisition, to stop payment on a check for $85,371.23 that USR mailed to Westfeldt to induce a new shipment of green coffee; (2) directed USR, prior to the acquisition, to continue its open coffee supply agreement with Westfeldt; and (3) directed USR to keep the "impending acquisition" of USR a secret from Westfeldt. The district court concluded Westfeldt provided insufficient evidence to defeat Ronnoco's motion for summary judgment on this claim. We agree.

LUTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La. Stat. Ann. § 51:1405(A). The range of prohibited practices is "extremely narrow":

> LUTPA does not prohibit sound business practices . . . . The statute does not forbid a business to do what everyone knows a business must do: make money. . . . [T]he statute does not provide an alternate remedy for simple breaches of contract. There is a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes.

Cheramie Servs., Inc. v. Shell Deepwater Prod., Inc., 35 So. 3d 1053, 1060 (La. 2010) (quotation omitted). "The defendant's motivation is a critical factor -- his actions must have been taken with the specific purpose of harming the competition." IberiaBank v. Broussard, 907 F.3d 826, 839-40 (5th Cir. 2018) (quotation omitted).

No action taken by Ronnoco rises to the level of "egregious behavior" LUTPA prohibits. Ronnoco's alleged request that USR not disclose its potential acquisition to Westfeldt and continue business as usual by purchasing coffee on credit is not "egregious behavior" falling outside the regular course of business transactions. It is conduct to be expected of a party seeking to acquire a going concern. Westfeldt places great emphasis on its allegation that Ronnoco "directed" USR to stop payment on an $85,371.23 check to Westfeldt. But at that time, Ronnoco had not yet acquired USR or its assets and thus had no authority to compel that USR action. Even if USR officers were persuaded to favor Ronnoco as a potential acquirer that could "save the enterprise," Westfeldt does not contend the stop payment was unlawful. Rather, Westfeldt contends the stop payment was unfair because Westfeldt relied on the check as satisfying its demand that USR pay an old debt before each Westfeldt new coffee shipment. Of course, Westfeldt could have verified USR's compliance simply by cashing the check before shipping the coffee. Its failure to do so was not reliance wrongfully induced by Ronnoco, or by USR. Like Westfeldt's decision to continue

making unsecured shipments to a financially troubled customer, its decision to ship the coffee first was a business risk *Westfeldt* chose to take. The delivery of coffee for which Westfeldt was not paid is a simple breach of contract claim, the type of dispute that is not actionable under LUTPA. Cheramie, 35 So. 3d at 1060.

Finally, Westfeldt presented no evidence that any action taken by Ronnoco was taken "with the specific purpose of harming Plaintiffs." Monroe v. McDaniel, 207 So. 3d 1172, 1180 (La. App. 2016). Ronnoco acted to protect and further its own financial interests, doing "what everyone knows a business must do: make money." Cheramie, 35 So. 3d at 1060.

B. Conversion. Again, the district court's conclusion that Louisiana law applies to Westfeldt's conversion claim is not at issue on appeal. Under Louisiana law, "conversion consists of an act in derogation of the plaintiff's possessory rights." Quealy v. Paine, Webber, Jackson & Curtis, Inc., 475 So. 2d 756, 760 (La. 1985). Plaintiff must prove "an intentional dispossession and/or exercise of dominion or control over the property of another in denial of or inconsistent with the owner's rights." Melerine v. O'Connor, 135 So. 3d 1198, 1203 (La. App. 2014). Westfeldt argues Ronnoco committed conversion when it acquired green coffee Westfeldt shipped to USR prior to the February 2015 Asset Sale, roasted the coffee, and sold it for profit without paying Westfeldt.

The district court granted summary judgment dismissing this claim because Ronnoco purchased the coffee from Great Western at a foreclosure sale and therefore Westfeldt failed "to establish that Ronnoco acted in derogation of Westfeldt's possessory rights." We agree. On appeal, Westfeldt argues good title never passed to USR because it did not pay for the coffee. This assertion is dubious given that the

-10-

coffee was shipped "FOB - New Orleans, LA."[3]   But in any event, Westfeldt conceded that Great Western's collateral included coffee delivered by USR vendors. Great Western had a perfected security interest in the coffee in USR's possession, and therefore Ronnoco purchased the coffee from Great Western, not in derogation of Westfeldt's rights.  The Louisiana uniform commercial code allows a secured creditor to take possession and sell collateral after default.  La. Stat. Ann. § 10:9-610(a).

C.  Unjust Enrichment.  The district court's conclusion that Iowa law governs Westfeldt's unjust enrichment claim is not at issue on appeal.  To establish this claim, Westfeldt must prove "(1) defendant was enriched by the receipt of a benefit; (2) the enrichment was at the expense of the plaintiff; and (3) it is unjust to allow the defendant to retain the benefit."  State ex rel. Palmer v. Unisys Corp., 637 N.W.2d 142, 154-55 (Iowa 2001).  "The critical inquiry is that the benefit received be at the expense of the plaintiff."  Id. at 155.

Westfeldt argues that Ronnoco was unjustly enriched when it received the benefit of numerous coffee shipments before the asset sale that USR never paid for, and sold the coffee at a profit after the asset acquisition.  The district court granted summary judgment on this claim because USR received the coffee shipments, Ronnoco acquired USR's inventory from Great Western, and "it is not unjust to allow Ronnoco to retain any alleged benefit."  We agree.  It is not unjust to allow an independent purchaser at a foreclosure sale to retain the benefit of assets acquired at a commercially reasonable price.  Ronnoco did not receive this benefit at the expense of Westfeldt.  Westfeldt's expense was incurred when USR did not pay for coffee Westfeldt delivered.  Thus, Westfeldt's failure to establish Ronnoco's liability as successor obligor dooms this claim as well.

---

[3]"[T]he F.O.B. term usually indicates the point at which delivery is to be made and will normally determine risk of loss."  Nat'l Heater Co. v. Corrigan Co. Mech. Contractors, Inc., 482 F.2d 87, 90 (8th Cir. 1973).

D. Breach of Futures Contracts.  Westfeldt alleged that Ronnoco breached "futures contracts" to sell coffee to USR that were in effect when Ronnoco acquired USR's assets from Great Western, and that Ronnoco breached oral assurances after the acquisition to continue those contracts.  The district court dismissed these claims and subsequently denied Westfeldt leave to file an amended counterclaim, concluding that the Asset Sales agreement did not include Ronnoco's assumption of these USR obligations, and that the alleged oral assumption of futures contracts was barred by the Iowa Statute of Frauds.[4]  See Iowa Code Ann. § 554.2201.  Having carefully considered Westfeldt's contrary arguments on appeal, we affirm the district court's rulings.

E.  Tortious Interference and Conspiracy.  In its third party complaint, Westfeldt alleged that USR officers Fischer and Hodgson intentionally interfered with Westfeldt's contractual relations and that Ronnoco officers Meader and Bomball conspired with Fischer and Hodgson to commit this wrongful act.  The district court dismissed the first claim because the alleged tortious interference was committed by non-parties Fischer and Hodgson, not by the third party defendants.  Westfeldt only challenged this ruling at the end of its reply brief, so the issue is forfeited on appeal. The district court dismissed the conspiracy claim because "conspiracy by itself is not an actionable claim under Louisiana law." Crutcher-Tufts Res., Inc. v. Tufts, 992 So. 2d 1091, 1094 (La. App. 2008), citing Ross v. Conoco, Inc., 828 So. 2d 546 (La. 2002).  On appeal, Westfeldt argues the district court either misinterpreted the Louisiana law of civil conspiracy or erred in denying leave to file an amended complaint adding an underlying tort claim against Fischer and Hodgson.  Having

---

[4]We agree with the district court that Westfeldt's claims would fail under Louisiana law as well.  See La. Civ. Code arts. 1821, 1823, and 1947.

considered these arguments, we conclude the district court did not err and did not abuse its discretion in denying a futile amendment.

The judgment of the district court is affirmed.

_____